IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 19, 2021 Session

## JOHN WILLIAM OWENS v. MEREDITH ELIZABETH OWENS

**Appeal from the Chancery Court for Meigs County**
**No. D-1746   Casey Mark Stokes, Judge**

_____

**No. E2020-01470-COA-R3-CV**

_____

This is an appeal of rulings by the trial court in a contentious divorce action. Following a bench trial, the trial court valued the parties' marital assets and divided the marital estate equally. The court awarded the husband the marital home upon his payment to the wife of one-half the combined equity, equal parenting time, and designation as the primary residential parent. The court found that the wife was not entitled to alimony. The wife, inter alia, challenges the trial court's division and valuation of the marital estate, in declining to award her attorney's fees, in awarding the parties equal parenting time, and the designation of the husband as primary residential parent. Having carefully reviewed the voluminous record, we affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

Phil Lawrence, Chattanooga, Tennessee, for the appellant, Meredith Elizabeth Owens.

Joshua H. Jenne, Cleveland, Tennessee, for the appellee, John William Owens.

**OPINION**

### I. BACKGROUND

John William Owens ("Husband") filed his complaint for divorce on March 19, 2019. Meredith Elizabeth Owens ("Wife") responded with a counter-complaint. All concerned agree that the marriage has been rocky since its inception. Husband's mother

testified that "[t]heir marriage has always been a battle," as "[t]hey've argued and fussed the whole time they've been married."

The trial was conducted over the following nonconsecutive days: July 15, July 17, July 22, August 5, and August 14, 2020.

Wife was 52 years old at the time of trial. After completing three years of undergraduate study at the University of Kentucky, she attended Auburn University's veterinary school for four years, receiving her bachelor's degree and veterinary degree from Auburn. Husband was also 52 years of age at the time of the trial. Like Wife, Husband has a veterinary degree from Auburn. After starting their veterinary careers in Alabama, Wife and Husband married in 1994, and Husband returned to his hometown of Cleveland, Tennessee, to work at Taylor Animal Hospital ("TAH"). They moved into the marital home they constructed on Fisher Hollow Road in 2000.

Wife essentially worked full-time until the parties' first child, Caroline, was born on August 9, 2001. According to Wife, she had desired to continue working full-time, but Husband did not approve. About 12 weeks after Caroline's birth, Wife began working three days per week and maybe every other Saturday. The parties' second child, Fletcher, was born December 17, 2003; he was 16 years old at the time of trial and was entering his junior year in high school. After Fletcher's birth, Wife worked Mondays, Thursdays, Fridays, and Saturdays. When Caroline was playing travel softball, Wife worked only Mondays and Thursdays in order to be able to take Caroline to three-day tournaments.

## Property

The property on Fisher Hollow Road consists of three separate tracts of land amounting to a combined 70 plus acres in size. The land on which the couple began building their home in 1999 was purchased in 1994. They first built fencing to contain horses and cattle, dug a pond, and built several barns and buildings. Wife and others testified to the extensive physical labor in which she engaged.

The parties stipulated that the value of the marital residence and approximately 55 acres should be $590,000, based on an appraisal performed by Billy Thacker/Cleveland Appraisal Services. As to the separate, adjoining tracts consisting of 12.04 acres and 1.6 acres, Wife argued that their value should be included in the $590,000 amount. Husband asserted that the separate tracts should be valued separately, assigning values of $25,000 and $5,000, respectively. A separate vacant tract of land on Fisher Hollow Road, approximately 95 acres in size, was used primarily by Husband for recreational and hunting purposes. Husband valued it at $300,000, based upon an appraisal performed by Billy Thacker/Cleveland Appraisal Services. Wife valued the 95 acres at $425,000, based upon the appraisal of Ed Blake Company.

## Veterinary practice/assets

Husband purchased a 25% interest in TAH in 1997 for $184,000. Three years later, he bought Dr. Robert F. Taylor's remaining 20% interest for approximately $147,000, giving him a total interest of 45%. In 2005, Dr. Taylor sold Husband and Dr. Mitchell C. Jordan his remaining interest in the building housing TAH.

Under the operating agreement's terms, the practice members were obligated to execute a certificate of value each year. In 2019, Dr. Jordan and Husband assigned a value of $2,532,003 to their combined interests in TAH. Husband valued his 45% interest at $1,139,401.37 (not including the value of the building and the land).

## Valuation of Taylor Animal Hospital

William Robert Vance, Jr., a C.P.A. and the owner of Forensics and Valuation Services, testified on Husband's behalf regarding the value of TAH. Mr. Vance valued TAH in total as of June 30, 2019, at $1,281,502. Applying discounts for lack of marketability (10%) and lack of control (20%), Husband's 45% interest was valued at $415,000.[1] Mr. Vance supplemented his report as of December 31, 2019, valuing TAH in total at $1,431,720 and Husband's 45% interest at $464,000.

Mr. Vance testified that despite the fact that as an LLC, TAH is a pass-through entity where the owners pay their proportion of the taxes and no tax is paid at the entity level, he applied a "tax effect." He deducted 6.5% excise tax for the State of Tennessee and the 21% federal tax rate on corporations so that approximately $100,000 was deducted from

---

[1] Tennessee Code Annotated section 36-4-121(c) provides as follows:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

\* \* \*

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset[,] is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence.

The statute does not mandate the application of discounts for lack of marketability or lack of control but merely recognizes that they could be applied if relevant and if supported by the evidence.

the cash flow of the business to account for taxes.

Mr. Vance observed that when he considered the market approach to business valuation, he arrived at $1,281,502, relatively near the value assigned by Dr. Richard Alan Goebel, Wife's valuation expert, of $1,200,000. Mr. Vance contended that it is Dr. Goebel's improper refusal to apply a discount for lack of marketability and a discount for lack of control that causes the primary difference between the experts.

Dr. Goebel is a doctor of veterinary medicine. He works for Simmons and Associates, which provides a transactional service to facilitate buying and selling of veterinary practices; it also provides valuation services in order to price veterinary practices for management and litigation purposes. Simmons and Associates has compiled a proprietary database that reflects data regarding veterinary sales transactions since the mid-1970s.

Dr. Goebel noted that his analysis was similar to Mr. Vance's on certain items, but that he differed with Mr. Vance on tax-effecting and the discounts for lack of control and lack of marketability. Dr. Goebel's position is that most veterinary practices are pass-through entities, as is TAH, and there is no tax at the business entity level. He further found no reason for the subsequent-event adjustment for the pandemic because companion animal veterinary practices tend to be recession resistant. He determined Husband's 45% interest's value to be $1,200,000.

Husband acknowledged that companies had made offers to buy the practice. One purchase offer was for $4.2 million; another was for about $3.3 million.

Husband valued his 45% interest in the building housing TAH on Keith Street at $224,055, 45% of the value assigned by the county tax assessor. Wife asserted that the 45% interest should be valued at $292,500, 45% of the total value of $650,000 assigned by the Ed Blake Company.

Husband identified a 50% interest in a hobby business, J & J Cattle, LLC, with another member, Jim Burch, in which Husband has a capital investment of $86,500. He also owns an interest in a robotic roping dummy product he developed, a mechanical steer. At the time of trial Husband had a loan balance of $61,000 related to these ventures.

## Wife

Wife testified that in addition to working as a veterinarian, she performed the child care duties and cooked dinner every night. From preschool to high school, Wife took the children to school in the morning and picked them up from school or from their practices in the afternoon. When Caroline played travel softball, Wife drove her to those activities. As to Husband's participation, Wife related, "He didn't do a whole lot."

Husband did not routinely make himself available to help the children with their homework.  One activity that he did not encourage was reading, telling them

> that reading books was stupid.  And he would tell them that—"Look at me, I hate books and I make all kind of money.  And your mother loves books and is book smart, but she can't make any money."

Wife testified that Husband was usually drinking a beer when he came in the door from work; he would go down to the neighbors' house and would often return home drunk.  Wife acknowledged that during the last few years, Husband spent little time at home.

> According to Wife, Husband "really kind of ignored" Caroline after she quit softball.  In regard to Fletcher, Wife testified that Husband

> calls him an idiot.  He calls him stupid.  He belittles him quite a bit, and he has since Fletcher was young.  He comes in—after he takes Fletcher to do something on the farm and comes in yelling at Fletcher.  And he calls him a mama's boy.  He'll say he is gay.  He'll—if he was playing video games, he would tell him he was gay.  He would threaten to take pictures of him and send them to his kids to humiliate—or his friends to humiliate him.  He was always very critical of him.

Wife asserted that Husband used coarse language around the children, talked about subjects that were inappropriate for them to hear, and made them uncomfortable.

> According to Wife, Husband did not like for her to take the children to church and would get upset if they went.  He would get the children up early on Sunday to engage in a project and fail to bring them back to the house in time to get ready for church services.

> Wife acknowledged that there was a good bit of bickering in the household.  She asserted that Husband criticized her for the house not being clean enough because she had "run with the kids all day."  Wife stated that Husband got angry and yelled at her, calling her lazy, stupid, and telling her that she was nothing.  She claimed that he criticized her cooking and might stand and yell at her for up to two hours while she was trying to prepare a meal.  Wife testified that she was never unfaithful to Husband, but he would accuse her of getting home late because she had stopped at some guy's house without naming anyone in particular—just a random accusation.  When Wife was pregnant with Caroline, Wife noted that Husband often made accusations that the child was not his.  According to Wife, he made the same accusations when she was pregnant with Fletcher.  Husband accused Wife of having affairs in front of the children.  Husband told Wife a number of times during the marriage that he wanted to divorce her.

> According to Wife, the residential parenting arrangement established during the

divorce case that required Fletcher to visit with Husband on alternate weekends had been "rocky." She noted that she had encouraged Fletcher to visit with Husband and had "dragged him out the door and put him in the car and taken him to John's." Wife asserted that she believed it to be in Fletcher's best interest to have a father-son relationship, that it is important, and that she tried to encourage it.

Wife testified that she became aware Husband had taken Fletcher around his paramour Melanie Hollis long before the divorce was filed. She learned of Husband's affair when she was served with a subpoena to testify in Ms. Hollis's divorce case. In April 2019, Husband informed Wife that he had been seeing Ms. Hollis for the previous two and one-half years.

## Husband

Husband admitted that the couple argued and bickered at times and that both children witnessed the arguments, confrontations, screaming, and yelling. Husband stated: "[Y]ou think a kid may fix it, you know. Then you have children and then you're stuck there for a while, you know." Husband observed that the last time he had any hope that his marriage to Wife would be long-term and successful was ten years ago. Husband acknowledged that he has been involved in "affairs, romantic relationships and sexual relations with other women during the marriage." The affairs to which he admitted were with Megan McKay, Trista Bearden Welch, and Ms. Hollis.

Husband noted that Fletcher "never wanted to do anything really with me much" and that his son rejected him from the age of 9 or 10 "up until now." When Husband was presented with an interrogatory in the current divorce case indicating that Fletcher had told Wife about Husband taking his son around Ms. Hollis at an Atlanta Braves game, he told Fletcher, "F ____ You, I'm done with you, and I don't want to do anything with you anymore." Husband admitted in his testimony that he had taken Fletcher around Ms. Hollis at the baseball game before the divorce was filed; his justification was that he was not under a court order at the time not to do so.

At trial, Husband presented an audio recording of Wife talking to Fletcher and making comments in which she extensively questioned his intelligence and agreed with Husband's prior verbal abuse also concerning his intelligence. Husband also presented an audio recording in which Wife refers to Caroline as a "F__-ing asshole" and Caroline refers to Wife as a "bitch." Husband testified that during the pendency of the divorce case, he discovered tracking devices on the underside of both of his trucks and a recording device that Wife installed in the marital home that recorded a dinner party Husband hosted during a time when Wife was absent.

**Trista Bearden Welch**

Trista Bearden Welch testified that when she worked at TAH, she engaged in an intimate relationship with Husband for about two years. To keep the affair a secret from Wife, Ms. Welch, then 20 years old, gave Husband a cell phone with which to communicate with her. Husband called the phone "Big Pimpin" and "BP" and kept it under the seat in his truck or in a drawer at TAH. According to Ms. Welch, engaging in "threesomes … was one of the stipulations he gave me for leaving Meredith." She acknowledged engaging in that activity with Husband and Megan McKay. Ms. Welch claimed to be doing the things that she thought Husband wanted her to do in order for him to leave Wife.

Ms. Welch testified that she was present in the Fisher Hollow Road home often because Husband wanted her to become familiar with his children before he left the marriage. She recalled observing Wife working in the garden, in the hay, and on the tractor; following those activities, Wife would always come inside and prepare dinner. Ms. Welch noted that Wife would always do whatever Husband desired to do at the time. She observed that Husband did not do much with the children during the times that she was in the home— it was mainly Wife taking care of them. According to Ms. Welch, on multiple occasions Husband was really rude to Wife. She testified that Husband had taken a photograph of Wife down on her hands and knees apparently crying; he would display this photo to people at TAH, laugh about it, and make fun of her.

Sometime between May and August 2019, Husband contacted Ms. Welch to tell her that he had received some papers inquiring about his affairs. He stated that he was not going to name her, but if she were subpoenaed to court, he would say that he just forgot to include her. Husband's first interrogatory responses did fail to mention the affair with Ms. Welch. Eventually, however, he supplemented his responses to disclose that the affair had occurred.

**Fletcher Owens**

Fletcher Owens, who will be 18 years old on December 17, 2021, testified that he held a 4.0 grade point average and enjoys school. He plays baseball on the Cleveland High School team as a second baseman, shortstop, and pitcher. Fletcher is a member of Wesley Memorial Methodist Church and enjoys attending services there. According to Fletcher, Husband told him that he could not go to Wesley Memorial unless he also went with Husband to the Catholic church. Fletcher did attend the Catholic masses at times, but stated that he felt coerced. He noted that he chooses not to attend church while at Husband's because "past times when I've tried to go it would cause a lot of trouble with him and I just don't feel like dealing with that."

Fletcher described the experience of weekend visits with Husband as being "pretty rough." When asked about his preference regarding the primary residential placement, he

stated, "My preference is my mother." Instead of an equal time-sharing arrangement between his parents, Fletcher asserted that he would rather the alternate weekend arrangement continue or "all the way a hundred percent with my mom but I wouldn't like 50/50." Fletcher observed: "two days every other week that's hard enough for me. I can't imagine 50/50." He related, "I'm not very happy at my dad's in general." On cross-examination, Fletcher testified that even if Husband were awarded the farm and the house, he would rather spend 100% of his time with Wife somewhere else.

Fletcher recalled that Husband often called him "gay," an experience that he described as hurtful. Fletcher did not remember occasions when Husband displayed affection toward him in recent years. He observed that Husband makes inappropriate remarks all the time, is quite a heavy drinker, and is not a very loyal spouse. He noted that the parent who would serve as a role model for the personal qualities of good character was "[d]efinitely my mom," who is a "Christian, a loyal wife, hard worker." He stated that Wife is nice to everyone and that all of his friends love her. Fletcher noted that Wife provided 90% to 95% of the attention to him as compared to Husband.

Fletcher related that on occasions when he has invitations from friends on Husband's parenting weekends, obtaining permission from his father is never "clear-cut . . . he'll tell me yes sometimes and then he'll say, no, you can't go." Fletcher recalled the invitation from Husband to go to Disney World, but as it was a weekend that he was to be with Wife, he declined to go.

When asked what Husband could change to improve their relationship, Fletcher noted that there had been 16 years for Husband to change and that it was "coincidental" that he was claiming interest in him now. Fletcher opined that the counseling sessions had "not really" helped his relationship with Husband. Fletcher felt that future professional counseling "wouldn't hurt" but that he did not think it would work.

### Caroline Owens

Caroline Owens is now 20 years old. At the time of her trial testimony, she had finished her first year at Auburn University. Caroline related as follows regarding Wife: "My mom took us to school every day and picked us up every day. She did all of the house work, dishes, laundry. She helped every time we needed help outside on the farm." Caroline observed that Wife did all the grocery shopping and cooked 95% of the meals. She noted that when she and her brother needed help with homework, Wife provided it.

Caroline recalled hearing her parents arguing with raised voices and saying unkind things to each other; she observed at trial that "if she were in her mother's shoes, she would retaliate too" because of her being told "her whole life" that she was "a loser and worthless and those types of things . . . never did anything, she's lazy." Caroline related as to Wife:

[S]he definitely wasn't perfect, but now that I'm older I realize that she was there [for] most things and my dad wasn't. . . . She is kind. She is always there for me every time I call her. Ever[y] time I need something she always does it. She picks up the phone. She takes time out of her day to help me.

Caroline observed that the only activity Husband enjoyed with Caroline was softball and he was angry when she quit the sport.

According to Caroline, Husband and Fletcher had "never really gotten along," and that Fletcher "has good reason to not like him. He's called Fletcher gay and a mama's boy ever since he was a baby. Fletcher really had no chance to have good relationship with him." She noted that Fletcher and Husband have different interests, as Fletcher does not enjoy hunting and fishing and prefers sports and hanging out with his friends. Husband, however, wants to do what he wants to do—it's never about what Fletcher wants to do. She echoed Fletcher's testimony that Husband would call him gay for enjoying video games, make fun of him, and tell him that he was not normal. She observed that Husband has "never been nice to Fletcher" and that the mean comments from Husband were "really hurtful for Fletcher . . . hearing those things from your father is not a good thing ever."

Caroline testified that Husband rarely told his children that he loved them and never hugged them. She stated that he never expressed that he was proud of them; he just told them what they could have done better. According to Caroline, despite Husband never expressing love toward them, when the divorce started, he began texting them that he loved them.

Caroline observed that Fletcher so dreads spending time with Husband that he experiences a mood change when he has to go to Husband's to visit; she claimed that Fletcher becomes mad and upset at everyone each week that he has to go. She related that Wife would encourage Fletcher by saying, "Go have a good time, be respectful and happy and nice." According to Caroline, Wife told Fletcher that Husband loved him.

Caroline recalled Husband taking her to the Cayman Islands as a gift for her high school graduation; Fletcher accompanied them. Husband's first stop after arrival was at a liquor store, and he drank every day they were there. She described one night that he was very intoxicated, damaged the car by driving into orange poles that marked roadwork, slurred his words at a restaurant, and tripped over himself.

## Dr. Biller

Dr. Owen Tom A. Biller, Jr. ("Dr. Biller"), a clinical psychologist, testified in Husband's case in chief. He first met with Fletcher on July 3, 2019, at which time he described Fletcher as being a "little bit guarded, a little cautious." In their session a week later, Fletcher related that he was comfortable with spending time with both parents. On

July 15, Dr. Biller met with Wife, and had sessions with Husband on June 21, July 12, and July 19. On July 24, Fletcher informed Dr. Biller that his preference was to live with Wife as primary custodial parent and have alternate weekend visits with Husband; he "admitted that he is angry with his father . . . his father drinks more than he would like . . . his father is rude to people." Fletcher also stated that "he does not choose to do things with his father. He does things with his mother. He feels more comfortable to go places with her." Dr. Biller noted that Fletcher was "very clear that he doesn't think he's going to change and want to do things with his father." Fletcher gave Dr. Biller a "litany of reasons that he considers his father someone he does not want to be with . . . [and] as a result of these things he is willing to write off his father. He does not think that his father could make the changes he would like to see in order to be comfortable being with him." Fletcher explained to Dr. Biller that "he does not consider his father to be a good person." Fletcher also related that his opinion of Husband did not develop overnight and that his feelings were based "on observations of his father over his lifetime."

The August 22 session was the only one Fletcher and Husband were together with Dr. Biller. Upon observing Fletcher to be "closed off," Dr. Biller attributed the reaction to either intimidation or resentment. Ultimately, however, Dr. Biller recommended that Husband "have uninterrupted time with his son" and that contact with Wife be limited during these intervals. When questioned whether he was forcing Husband and Fletcher to be together, he admitted that the following consequences were possible: it could result in heightened conflict between Fletcher and Husband, Fletcher could feel greater hostility and resentment, and Fletcher could become depressed. Dr. Biller opined that Husband would do everything to make Fletcher's time with him pleasant and comfortable because of the expense that he is incurring "to maintain and save his relationship with his son."

## Dr. Solovey

Dr. David Solovey, another clinical psychologist, also testified on Husband's behalf. Dr. Solovey stated that he views issues with regard to what is "least harmful" to children rather than what is in their best interests. From November 19, 2019, to March 3, 2020, Dr. Solovey met with Fletcher alone three times, with Fletcher and Husband together five times, alone three times with Wife, and alone four times with Husband. According to Dr. Solovey, Fletcher was protective of Wife and exhibited a desire not to have anything to do with Husband. Dr. Solovey acknowledged that Fletcher told him that his attitude toward Husband was not going to change and that he did not do things with Husband because he did not consider him to be a good person. Fletcher reported to Dr. Solovey that Husband drinks excessively and that he does not like being around that influence. Dr. Solovey noted that Fletcher has a level of frustration due to Husband's cheating on Wife and his own history of being bullied and publicly embarrassed by Husband.

## Trial Court's Ruling

The trial court announced its opinion from the bench on August 14, 2020. Upon finding that one expert determined the value of TAH to be $464,000 and the other expert found the value to be $1,200,000, the trial court concluded that Husband's 45% interest in the practice "was in the middle" with a value of $850,000. The court valued the Keith Street property at $555,555, and Husband's 45% interest in the building at $250,000. The trial court determined that the marital residence, the 55 acres, and the 14 acres, had a value of $600,000. The 95 acres was valued at $300,000. Finding that the value of the items that the trial court had mentioned in its ruling had a total value of $2,000,000, the court ruled that Husband would be awarded those "big ticket items" and would be required to pay Wife $1,000,000 for her marital share. The court ruled that other assets comprising the marital estate be split equally, and the parties' debt allocated between them. The trial court ordered that "child custody is going to be 50/50." No ruling was made on the personal property in the case; the trial court stated, "I'll leave that for [the lawyers] to work out." The court made no ruling on the issue of the granting of the divorce, alimony, and attorney fees.

On September 3, 2020, Husband filed a "Motion for Findings of Fact and Conclusions of Law." He appended as an exhibit a proposed memorandum and order. Wife filed a written objection to the motion. At the hearing on the motion on September 8, the trial court signed the memorandum and order, and on September 29, the trial court entered an order adopting it. On October 20, 2020, Wife filed a written objection to the parenting plan. The next day, the final judgment and decree of divorce was filed. On October 28, Husband filed a motion to amend the final judgment and attached a proposed amended final decree. The amended final judgment and decree of divorce was entered on November 5, 2020, incorporating by reference the previously signed memorandum and order. Wife thereafter filed this timely appeal.

## II. ISSUES

Wife raises the following issues on appeal:

a. Did the trial court err in failing to make independent findings of fact and conclusions of law and by adopting in toto the proposed findings of fact and conclusions of law tendered by Husband under circumstances indicating that the court failed to read and consider fully the proposed findings and conclusions.

b. Does the evidence in the case preponderate against finding that an equal time-sharing schedule between the parties for Fletcher was in his best interest and did the trial court abuse its discretion in ordering an equal parenting arrangement and in designating Husband the primary residential parent.

- 11 -

c.   Does the evidence in the case preponderate against a finding that Husband's 45% interest in TAH had a value of $850,000.

d.   Does the evidence in the case preponderate against the trial court's division of the marital estate, did the court err in preventing Wife from presenting evidence as to the value and classification of items of personal property, and did the court err in failing to make findings of fact with respect to various items of property in the marital estate.

e.  Does the evidence preponderate against the award of the marital residence to Husband, or, in the alternative, did the trial court abuse its discretion in awarding the marital residence to Husband instead of awarding the marital residence to Wife under circumstances where Wife may be granted a greater share of parenting time with Fletcher.

f.  Did the trial court abuse its discretion in failing to award Wife alimony.

g.   Did the trial court abuse its discretion in failing to award Wife her attorney's fees in the defense of Husband's divorce case against her and in connection with her claims for child support and residential parenting status with Fletcher.

h.   Did the trial court fail to make a factual finding to support declaring a divorce, or, in the alternative, does the evidence preponderate in favor of granting Wife a divorce on the grounds of Husband's inappropriate marital conduct.

i.  Is it appropriate to award Wife her fees for this appeal.

j.  Does the absence of findings of fact combined with the extent of the errors of the trial court assigned by Wife require that the case be remanded for proceedings below before a different judge.

Husband raises an additional issue:

k.  Should the court award him attorney's fees and expenses incurred in defending against Wife's appeal.


## III.  STANDARD OF REVIEW

This action was tried by the court without a jury, so we review the trial court's findings of fact de novo upon the record with a presumption of correctness unless the

- 12 -

evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Watson v. Watson*, 309 S.W.3d 483, 490 (Tenn. Ct. App. 2009). We give great deference to the trial court's credibility assessments. *Id.* We do not disturb "factual findings based on witness credibility unless clear and convincing evidence supports a different finding." *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009). We review the trial court's conclusions of law de novo with no presumption of correctness. *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007).

## IV. DISCUSSION

### a.

As noted above, Husband filed his motion for findings of fact and conclusions of law on September 3, 2020. On September 8, 2020, a hearing was held on Husband's motion. Wife's attorney registered objections to the trial court's awarding of a divorce without finding fault and the court's establishing an equal-time parenting arrangement for Fletcher. Before the hearing concluded, the trial judge signed the proposed memorandum order and declared, "Okay. I signed it." Wife asserts that the adoption of the lengthy 38-page memorandum and order with only a cursory review is an abdication of the trial court's duties and does not relieve the court of the duty to make its own findings of fact and conclusions of law.

Husband argues that nothing prohibited Wife from submitting a competing, opposing, and/or additional proposed findings of fact and conclusions of law. Similarly, nothing prohibited her from filing an appropriate motion or motions seeking relief or requesting the court to alter or amend its findings and conclusions. Husband claims one can assume the trial court reviewed the evidence thoroughly between the trial's conclusion and the date of the motion hearing; he further asserts that the assumption can be made that the court considered the proposed findings of fact and conclusions of law prior to the hearing.

Rule 52.01, Tennessee Rules of Civil Procedure, provides as follows:

In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.

The Tennessee Supreme Court has explained that Rule 52.01 findings and conclusions serve three important purposes:

First, findings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision. Second, findings and conclusions also serve "to make definite precisely what

- 13 -

is being decided by the case in order to apply the doctrines of estoppel and res judicata in future cases and promote confidence in the trial judge's decision-making." A third function served by the requirement is "to evoke care on the part of the trial judge in ascertaining and applying the facts." Indeed, by clearly expressing the reasons for its decision, the trial court may well decrease the likelihood of an appeal.

*Lovlace v. Copley*, 418 S.W.3d 1, 34-35 (Tenn. 2013) (internal citations omitted). "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009) (quoting *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. Apr. 21, 2004)).

In *Trezevant v. Trezevant*, 568 S.W.3d 595, 622 (Tenn. Ct. App. 2018), we noted:

There is no bright-line test by which to assess the sufficiency of factual findings, but "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue."

568 S.W.3d at 622 (citing *Lovlace*, 418 S.W.3d at 35) (quoting 9C Federal Practice & Procedure § 2579 at 328).

In *Delevan-Delta Corp. v. Roberts*, 611 S.W.2d 51 (Tenn. 1981), the Tennessee Supreme Court modified a prior holding that it was improper for a trial judge to permit or require counsel for the successful party to prepare written findings of fact. In modifying that holding, the Court stated the following:

We agree that the preparation of findings and conclusions is a high judicial function. We are committed to the requirement that the trial court's findings and conclusions be its own. . . . Findings prepared by the trial judge which represent his independent labor are preferable, however we do not disapprove of party-prepared findings. . . . We wish to point out that before adopting findings prepared by counsel, the trial judge should carefully examine them to establish that they accurately reflect his views and conclusions, and not those of counsel. He should also ascertain that they adequately dispose of all material issues, and to assure that matters not a proper part of the determination have not been included.

611 S.W.2d at 52–53.

Wife relies on *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 313 (Tenn. 2014):

> Judicial opinions are the core work-product of judges. They are much more
> than findings of fact and conclusions of law; they constitute the logical and
> analytical explanations of why a judge arrived at a specific decision. They
> are tangible proof to the litigants that the judge actively wrestled with their
> claims and arguments and made a scholarly decision based on his or her own
> reason and logic.

*Id.* at 313 (quoting *Bright v. Westmoreland Cnty.*, 380 F.3d 729, 732 (3rd Cir. 2004)).

Wife asserts that the trial court's adoption of the proposed memorandum and order in its entirety and without the alteration of a single syllable reveals that careful review of the findings and conclusions of law was not undertaken by the trial court. This issue makes clear the pitfalls of adopting in toto lengthy findings and conclusions submitted by a party. However, we are not convinced that Wife established that the findings do not reflect the views and conclusions of the trial court. Upon this record, we do not find that the conduct of the trial judge on this issue constitutes reversible error.

**b.**

The trial court provided that "Child custody is going to be 50/50." Wife argues this finding along with the ruling that Husband should be the primary residential parent is improper in view of Fletcher's preference and the poor relationship existing between Husband and son. Wife claims that the memorandum and order adopted by the trial court failed to make specific findings as to Fletcher's best interest or as to the application of the relevant statutory factors.

The General Assembly has declared that custody determinations "shall be made on the basis of the best interest of the child." Tenn. Code Ann. § 36-6-106(a). The needs of the child are paramount; the desires of the parents are secondary. *Lentz v.* Lentz, 717 S.W.2d 876, 877 (Tenn. 1986). Trial courts have "broad discretion in these matters." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Appellate courts decline to reverse a trial court's custody determination absent an abuse of discretion. *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013). A trial court abuses its discretion when it "appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment, or relies on reasoning that causes an injustice." *Id.* (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)).

Unless otherwise prohibited by Tennessee Code Annotated section 36-6-406, in setting the residential schedule, the trial court is directed to conduct a best interest analysis based upon the factors found in section 36-6-106(a)(1)–(15). Tenn. Code Ann. §36-6-404. These factors include:

> (1) The strength, nature, and stability of the child's relationship with each

parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents … to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents … to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent … to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent … denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. . .;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a)(1)–(15). Although the court was obligated to consider the applicable statutory factors, "the statute does not require a trial court, when issuing a memorandum opinion or final judgment, to list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination." *Burnett v. Burnett*, No. E2002-01614-COA-R3-CV, 2003 WL 21782290, at *6 (Tenn. Ct. App. July 23, 2003).

With regard to an equal parenting arrangement, Tennessee Code Annotated section 36-6-101(a)(2)(A) provides that neither a preference nor a presumption for or against joint legal custody is established. In *In re Emma E.*, No. M2008-02212-COA-R3-JV, 2010 WL565630, at *6 (Tenn. Ct. App. Feb. 17, 2010), we stated that "Courts have generally looked upon awards of 'joint custody' with disfavor, believing that such arrangements rarely promote the best interests of the child." In the *Darvarmanesh* case, we addressed joint custody arrangements:

Joint custody arrangements are appropriate in certain limited circumstances. However, while authorized by statute, joint custody arrangements are generally disfavored by the courts of this state due to the realization that such rarely serves the best interest of the child.

*Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL1684050, at *8 (Tenn. Ct. App. July 19, 2005) (internal citations omitted). As noted in *Darvarmanesh*,

The statute does not require that joint custody be awarded only when the parents are on friendly terms, however, in order for a joint custody arrangement to serve the best interest of the child, it requires a "harmonious and cooperative relationship between both parents." "While we have stopped short of rejecting this type of custody arrangement outright, divided or split custody should only be ordered when there is specific, direct proof that the child's interest will be served by dividing custody between the parents."

*Id.* (internal citations omitted). The same considerations present in *Darvarmanesh* that led

- 17 -

the court to reject an equal parenting arrangement appear in this matter. Husband argued for pages on end that continuing animosity and a marked lack of trust exists between the parties. Facts relating to the parties being inflexible and uncooperative in parenting the child are highly relevant to the determination of whether an equal parenting arrangement is in the child's best interest.

As to the first statutory factor, the evidence is undisputed that Fletcher's relationship with Wife is far stronger that his relationship with Husband. Fletcher's relationship with Husband is fraught with discord and disapproval over Husband's personal drinking habits, inappropriate comments, insults, and infidelity. Fletcher has been bullied and publicly embarrassed by Husband. Wife clearly had the majority of parenting responsibilities relating to Fletcher's daily needs throughout his life.

As to statutory factor 5, Wife bore the greater responsibility for performing parental responsibilities than Husband. She is the person who transported Fletcher to his school and to events in which he was involved. She prepared meals and did the laundry for the family.

In regard to factor 6, Fletcher's statements to the counselors reveal the level of disapproval, disfavor, and dislike that he has for Husband. Fletcher related to Dr. Biller that "he does not do things with his father, that he does not choose to do things with his father. He does things with his mother. He feels more comfortable to go places with her." To Dr. Solovey, Fletcher reported that Husband drinks excessively and that he does not like being around that influence. He resents Husband for cheating on Wife.

As to statutory factor 7, Fletcher appears to be a well-adjusted young man. He does well in school with a 4.0 grade point average, has friendships among his peers, and maintains a keen sense of right and wrong. He has developed a religious faith that is important to him. He enjoys playing baseball. No evidence was presented of Fletcher having disciplinary issues away from home or engaging in misbehavior. He has a close relationship with his sister, his paternal grandparents, and Wife. His expressions regarding his parents were based upon his observations of them over time and upon his personal experiences. There is no evidence that Fletcher has an emotional need for a split-parenting schedule; rather, the preponderance of the evidence reveals that his emotional needs are in conflict with such a schedule. He expressed emotional distress when he is required to spend a great deal of time with Husband.

In regard to factor 13, Fletcher is nearly 18 years old. His preference for his residential placement could not have been more clearly expressed or be more unequivocal. He believes that Husband is not a good person. That opinion did not develop overnight but was based upon observations over his lifetime. Husband even admitted that Fletcher "had exhibited some resistance [toward him] beginning at his age of approximately nine (9) or ten (10). . . ." Fletcher told the counselors that he does not want to do things with Husband

and his attitude is not going to change. The reasons for Fletcher's preference to be with Wife are objectively reasonable. They should be accorded significant weight.

The majority of the factors in this case are not equal, but favor Wife. As found in *Rajendran v. Rajendran*, No. M2019-00265-COA-R3-CV, 2020 WL5551715, at *10 (Tenn. Ct. App. Sept. 16, 2020), "Indeed, not a single factor favors [Husband] alone in this case." On the whole, the parties' continuing lack of trust and inability to cooperate are barriers to the joint parenting arrangement ordered by the trial court. The evidence presented and the factors contained in section 36-6-106(a) favor awarding Wife greater visitation than Husband. The trial court's decision regarding parenting time "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

Wife, like Husband, has made mistakes. Her efforts to interfere with Fletcher's time with Husband and any encouragement to spy on Husband were improper. But this court is not convinced that Husband and Fletcher "have historically had a good, close and loving bond and relationship," as claimed in the memorandum and order adopted by the trial court. Trista Bearden Welch, Husband's former paramour, testified that Husband did not do much with the children during the times she was present. Caroline observed that Husband had "never been nice to Fletcher." She noted that Husband rarely told his children that he loved them or expressed love toward them until the divorce was filed. She recalled that Husband had called Fletcher "gay" and "a mama's boy" since he was a baby. The findings of the trial court on this issue completely disregard the testimony of Fletcher, as well as other witnesses, and do not address any of the negative aspects of Husband's parenting.

On this issue, the trial court's judgment is reversed. The matter must be remanded for the entry of a parenting plan in which Wife is named primary residential parent and Husband is awarded reasonable, though not equal, visitation. In the interim, we reinstate the temporary parenting plan the parties were following during the pendency of the divorce proceedings. *See Kathryne B.F. v. Michael B.*, No. W2013-01757-COA-R3-CV, 2014 WL992110, at *7 (Tenn. Ct. App. Mar. 13, 2014).

**c.**

Wife asserts that the trial court's announcement from the bench at the conclusion of trial that one party's expert found the value of TAH to be $464,000, that the other party's expert found the value to be $1,200,000, and that the trial court decided that Husband's interest in the practice "was in the middle" with a value of $850,000, is not a finding of fact that should be accorded any presumption. She contends that the trial court provided no clue as to what elements of Mr. Vance's testimony it found to be convincing or what parts of Dr. Goebel's testimony were persuasive.

- 19 -

In *Owens v. Owens*, 241 S.W.3d 478, 489 (Tenn. Ct. App. 2007), we noted as follows:

> Placing a value on a minority interest in a business is not an exact science. In the face of conflicting opinions regarding the value of a marital asset, the trial court may place a value on the asset that is within the range of the values presented by the competent evidence. Since valuation evidence is inherently subjective, a trial court's valuation decisions need not coincide precisely with the valuation opinions offered into evidence.

(Internal citations omitted.).

The trial court elected to value Husband's 45% based on the average of the opinions of the experts. As noted in *Barton v. Barton*, No. E2019-01136-COA-R3-CV, 2020 WL 6580562 (Tenn. Ct. App. Nov. 10, 2020):

> [T]he value of a marital asset is determined by considering all relevant evidence regarding value. If the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence. Because the values set by the court were within the range of values presented, we find no error in the court's use of a "middle ground" valuation.

*Id.*, 2020 WL 6580562 at *9 (Internal citations omitted). Because the value the trial court placed on Husband's interest is within the range of values presented by competent evidence, we decline to second-guess the trial court's decision on this issue.

### d. & e.

The applicable law with respect to a trial court's valuation of the assets of a marital estate is as follows:

> The value of marital property is a fact question. Thus, a trial court's decision with regard to the value of a marital asset will be given great weight on appeal. In accordance with Tenn. R. App. P. 13(d), the trial court's decisions with regard to the valuation and distribution of marital property will be presumed to be correct unless the evidence preponderates otherwise.
>
> The value of a marital asset is determined by considering all relevant evidence regarding value. The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present. Thus the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted.

*Ramsey v. Ramsey*, E2012-01940-COA-R3-CV, 2013 WL5827648, at *3–4 (Tenn. Ct. App.

- 20 -

October 29, 2013) (citing *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987).

In all divorce cases, after classifying the parties' property, the trial court is directed to "equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1); *Luplow v. Luplow*, 450 S.W.3d 105, 109 (Tenn. Ct. App. 2014); *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at \*11 (Tenn. Ct. App. May 13, 2003).

An equitable division of marital property does not require that the property be divided equally. *Luplow*, 450 S.W.3d at 109–10 (citing *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002)). Nor does it require that each party receive a share of every item classified as marital property. *Morton v. Morton*, 182 S.W.3d 821, 833–34 (Tenn. Ct. App. 2005) (quoting *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998)). In making its determination, the trial court must consider statutory factors in view of the evidence presented by the parties. Tenn. Code Ann. § 36-4-121(c); *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003).

Tennessee Code Annotated section 36-4-121(c) provides as follows:

In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for

- 21 -

equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11) The amount of social security benefits available to each spouse; and

(12) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c)(1–12).

At the conclusion of the trial, the court announced its decision on the awarding of the real estate and business interest to Husband and the equalizing payment to Wife. The trial court directed the attorneys "to work out and personalize" the remaining marital assets. At the hearing on September 30, the trial court announced the approach to be taken in determining the value of the times of personalty in dispute:

Now, what I'm going to do as far as the values on everything, when the value is – if they agree on the value, that's great, but say, if the wife says the horse is worth 500 or the power saw, whatever it may be, if she said it's worth 500 and husband says its worth a thousand on this master list, then we're going to go to the middle, it's going to be worth 750. That's how we're going to do the values.

Further instructions were given as to how the items were to be apportioned between the parties:

> Now, we've done the horse already there. Now it brings us to just objects. What I want to do on the objects, it will be the same thing on the values we just stated, and then at the end, like, say – well, here's how I think we should do it. I'm going – there's numbers on all these so what I'm going to do, kind of unorthodox, I'm – we're going to assign even and odds to these. One gets the evens and one gets the odds. We can flip a coin and see who is even or odd, that's fine with me, whatever y'all want to do. And then one gets the odd numbers and one gets the even numbered items.
>
> And at the end if one person's items are worth a hundred thousand and the other person's items are worth 90 then they're going to pay the difference to make it even on the value. I feel like that's as fair as I can get it on realistically on personalty items.
>
> Do y'all want to flip a coin and see who is even or odd or y'all just want to pick? Doesn't matter to me.

Husband asserts that incorporated into the Amended Final Decree of Judgment and Divorce is Exhibit C, entitled "Court's Distribution," which set forth the trial court's classification, valuation, and division of the parties' property.[2]

In the case at bar, the trial court determined that an equitable distribution should be a mathematically equal one. The evidence does not preponderate against this determination. Based on the statutory factors and the trial court's broad discretion, we find no error in the trial court's distribution of marital property, which resulted in an award of 50% of the marital estate to each party.

As to Wife's claim to the marital residence, we note that section 36-4-121(d) of the Tennessee Code Annotated does provide as follows:

> The court may award the family home and household effects, or the right to live therein and use the household effects for a reasonable period, to either party, but shall give special consideration to a spouse having physical custody of a child or children of the marriage.

However, we discern that in prior filings, Wife indicated that she had insufficient income to provide for herself and maintain the marital residence and farm property. Further, Wife

---

[2] Husband's brief reflects that Wife, after the trial, removed items not awarded to her. Included among the nearly 8 pages of items are articles of furniture to waste baskets.

- 23 -

no longer has young children that require the care of a stay-at-home caregiver. The record supports the trial court's determination that Husband would be better able to maintain the property in an appropriate manner. Based on the evidence before us, we cannot find that the trial court abused its discretion in the division of the marital estate.

**f.**

The trial court announced at the September 8 hearing that it was not awarding alimony to Wife. Applicable and governing law regarding this issue is well-established:

> Tennessee Code Annotated § 36-5-121(i) directs the courts to consider all relevant factors "[i]n determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment." The statute lists nonexclusive factors to be considered including the relevant earning capacity, obligations, needs, and financial resources of each party; the relative education and training of each party; the ability and opportunity and necessity of each party to secure such education and training in order to improve such party's earning capacity to a reasonable level; and the assets of each party, whether they be separate assets or marital property awarded in the divorce.

Tenn. Code Ann. §36-5-121(i). It is well settled that the two most important factors to be considered in any spousal support determination are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Bratton v. Bratton*, 136 S.W.3d 595, 604 (Tenn. 2004); *Robertson v. Robertson*, 76 S.W.3d 337, 342 (Tenn. 2002).

Pursuant to section 36-5-121(i):

In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i)(1–12).

Husband asserts that during the course of the trial, no testimony was elicited from Wife as to the need for alimony of any kind, type, or form, and Wife did not testify as to any amount which, arguendo, should be considered as a basis for her need. Wife did offer her sworn Income and Expense Statement as a trial exhibit, and she acknowledged her current gross income as approximately $6,300 per month/current net income as approximately $5,500 per month. She will also receive child support until Fletcher ceases to be a minor.

Husband contends that Wife is now relieved of expenses relative to the mortgage

and "farm expenses." He argues that Wife has a net disposable income, inclusive of child support, in an amount sufficient to pay her expenses. He therefore asserts that she has not established a need for alimony of any kind.

Wife acknowledges that she has the same education, degree, and certifications as Husband. She is receiving a significant amount of cash relative to her ½ interest in the 45% of TAH as well as the real estate herein awarded to Husband. Wife acknowledges that her pay scale and/or salary equates to approximately $500 per day. She admits that she could increase her income by $500 per week and/or $2,000 per month simply by working one additional day per week to occur on either a Monday, Friday or Saturday.

However, Wife, age 52 at the time of trial, contends that she sacrificed her career as a veterinarian in order to fulfill the role of mother and homemaker while Husband has devoted his time to building his practice to the extent that his income is several multiples of the income that Wife has been able to make. Although she continued to work part time, Wife claims that she did not have the opportunity to advance her career in the same way as Husband did, and the record contains evidence that Wife was encouraged by Husband to stay home to raise the children and be a homeworker. She maintains that she has reached an age when her opportunity to advance her career has been diminished. Wife is now an employee working for a wage and lacks the ability as a business owner to reap the same benefit of labor expended to income received as Husband. Additionally, she notes that because the trial court awarded the marital residence to Husband, she will be required to deplete a substantial portion of her financial award to purchase a comparable home and her income will be insufficient to make the considerable mortgage payments. Accordingly, Wife argues that the record does not reflect that the trial court applied the multiple factors provided in Tennessee Code Annotated section 36-5-121(i)(1)–(12).

In *Broadbent v. Broadbent*, 211 S.W.3d 216 (Tenn. 2006), the Court, finding that the trial court had not specifically recited the factors it considered in determining its alimony award, described the remedial action to be taken under those circumstances:

> We, however, have carefully examined the record in light of the [statutory] factors . . . and conclude that the evidence preponderates in favor of the trial court's judgment. *See Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000) (stating that when a trial court has made no findings of fact regarding the relevant statutory factors, an appellate court must conduct its "own independent review of the record to determine where the preponderance of the evidence lies.").

*Id.* at 220.

The trial court concluded that Wife had not proven that she is economically disadvantaged as compared to Husband and that Wife had not established a need for

alimony or spousal support. Wife has substantial earning capacity and the ability to work. As to the issue of fault, the weight to be given to it is a matter of discretion. Having concluded that Wife has failed to carry her burden to prove that she is economically disadvantaged and/or to establish need, any need to address Husband's potential ability to pay is pretermitted. Based on the evidence before us, we cannot find that the trial court abused its discretion in declining to award Wife alimony.

**g.**

At the conclusion of trial, Wife's attorney requested to be allowed to file an affidavit and a time statement for the determination of the issue of attorney's fees. The trial court responded, "Okay … that's fine." However, before the trial court had entered a final judgment in the case and before the timing was appropriate to submit Wife's claim for attorney's fees, the court announced at September 8 hearing that it would not award attorney's fees in this case. No reasoning was provided for the ruling.

Wife submits that the preponderance of the evidence is in favor of an award of attorney's fees; in the alternative, she argues that the award of attorney's fees is sought for two separate aspects of the case, for the divorce itself in the form of alimony and for the adjudication of the custody and support issues relative to Fletcher.

The trial court's decision regarding attorney's fees in a divorce proceeding is within the sound discretion of the trial court and will not be disturbed upon appeal unless the evidence preponderates against it. *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992). As our Supreme Court has stated:

> The trial court's determination of a reasonable attorney's fee is "a subjective judgment based on evidence and the experience of the trier of facts," and Tennessee has "no fixed mathematical rule" for determining what a reasonable fee is. Accordingly, a determination of attorney's fees is within the discretion of the trial court and will be upheld unless the trial court abuses its discretion. We presume that the trial court's discretionary decision is correct, and we consider the evidence in the light most favorable to the decision. The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court, and we will find an abuse of discretion only if the court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party."

*Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011) (internal citations omitted).

In *Gonsewski*, 350 S.W.3d at 113, our Supreme Court observed:

It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. The decision whether to award attorney's fees is within the sound discretion of the trial court. As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, or the spouse would be required to deplete his or her resources in order to pay them. Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony.

(Internal citations omitted).

From the record it appears that Wife's assets will include a minimum yearly income of $75,000/year; $1,000,000 in cash; retirement/investment accounts totaling $632,128.30; and additional retirement/investment to be transferred by Husband to Wife totaling $92,244.23. If a party has adequate property and income, or is awarded adequate property in the divorce, from which to pay his or her own expenses, an award for attorney's fees may not be appropriate after consideration of all relevant factors. *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000); *Duncan v. Duncan*, 686 S.W.2d 568, 573 (Tenn. Ct. App. 1984). Wife's argument that there has been an abuse of discretion is without merit.

As to the visitation issue, the granting of attorney's fees is authorized by Tennessee Code Annotated section 36-5-103, providing that:

(c) A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

Tennessee courts long have recognized that the decision to grant attorney's fees under section 36-5-103(c) is largely within the discretion of the trial court. Despite the fact that in applying section 36-5-103(c), "counsel fees incurred on behalf of minors may be recovered when shown to be reasonable and appropriate," *Taylor v. Fezell*, 158 S.W.3d 352, 360 (Tenn. 2005) (citing *Deas v. Deas*, 774 S.W.2d 167, 169 (Tenn. 1989)), there is

no absolute right to such fees. After a review of the circumstances at issue, we find no abuse of discretion on this ground.

**h.**

The trial court failed to make any finding as to the relative fault of the parties, or, for that matter, whether it found fault on the part of either of them. On September 8, 2020, the court ruled, "I'm just going to declare them divorced."

There is no dispute that a trial court has statutory authority to declare parties in a divorce case to be divorced as an alternative to granting a divorce to either of them. Section 36-4-129(b) of the Tennessee Code Annotated provides as follows:

> The court may, upon stipulation to or proof of any ground of divorce pursuant to § 36-4-101, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce or if a divorce is to be granted on the grounds of irreconcilable differences, declare the parties to be divorced, rather than awarding a divorce to either party alone.

The proof was clear in this case that marital and relationship problems existed in this marriage from its inception. Various witnesses confirmed the discord. Both parties acknowledged their fault in the demise in the marriage and that irreconcilable differences exist. There is "no requirement of a written finding by the trial court that both parties were at fault or which party was less at fault." *Varley v. Varley*, 934 S.W.2d 659, 665 (Tenn. Ct. App. 1996). Accordingly, we find no error in the court's decision to declare the parties divorced. *Fulbright v. Fulbright*, 64 S.W.3d 359, 364 (Tenn. Ct. App. 2001).

**i. & k.**

The decision whether to award attorney's fees on appeal is a matter within the sole discretion of this court. *Chaffin v Ellis*, 211 S.W.3d 264, 294 (Tenn. Ct. App. 2006); *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). The factors to be applied when considering a request for attorney's fees incurred on appeal include:

> 1. The ability of the requesting party to pay fees;
> 2. The requesting party's success in the appeal;
> 3. Whether the requesting party sought the appeal in good faith; and
> 4. Any other equitable factors that need to be considered.

*Ellis v. Ellis*, 621 S.W.3d 700, 709 (Tenn. Ct. App. 2019). Exercising our discretion, we decline to award either party attorney's fees on appeal.

**j.**

We do not deem it necessary to reassign the case to another trial judge on remand.

The last issue before us is Wife's petition for this court to rehear her motion to remand to the trial court. This motion was deferred to the panel.

Wife notes that a major contested issue at trial was the value of Husband's interest in TAH. She claims that during the course of the case, Husband minimized and dismissed the possibility of the sale of his interest in TAH. She contends that Husband, knowing fully of the pending sale of his interest, fraudulently misrepresented that no sale was contemplated. According to Wife, evidence exists that TAH was sold to National Veterinary Associates, Inc. and that preliminary aspects of the sale occurred before the entry of final judgment in the divorce. Subpoenas to obtain information related to the sale were quashed by the trial court and this court denied Wife's interlocutory appeal.[3]

Husband argues that even if TAH has been sold, the investment price received was for 100% of the operation. He claims that amount is not relevant to the issue that was before the trial court—the value of Husband's 45% minority interest in TAH.

We understand Wife's exasperation concerning the true valuation of Husband's interest in TAH, but we find no direct proof before us that Husband engaged in fraudulent activity. We, therefore, decline the relief she requests.

## V. CONCLUSION

The judgment of the trial court designating Husband the primary residential parent and ordering an equal parenting arrangement is reversed. The judgment of the trial court in all other respects is affirmed. The cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed one-half to the appellant, Meredith Elizabeth Owens and one-half to the appellee, John William Owens.

_____
JOHN W. MCCLARTY, JUDGE

---

[3] No. E2021-00518-COA-R9-CV.